*INDIANA COMMERCIAL COURT*

| | | |
|---|---|---|
| STATE OF INDIANA | ) | MARION SUPERIOR COURT NO. 1 |
| | ) SS: | CIVIL DIVISION, COMMERCIAL |
| COUNTY OF MARION | ) | CAUSE NO. 49D01-1807-PL-026131 |

KEY BENEFIT ADMINISTRATORS, INC.,   )
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
TELADOC, INC., and　　　　　　　　　)
HY HOLDINGS, INC. D/B/A　　　　　　)
HEALTHIEST YOU,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

**FIRST AMENDED AND SUPPLEMENTAL VERIFIED COMPLAINT**

Plaintiff Key Benefit Administrators, Inc. ("KBA"), for its First Amended and Supplemental Complaint against defendants Teladoc, Inc. ("Teladoc") and HY Holdings, Inc. d/b/a Healthiest You ("HY" and, together with Teladoc, "Defendants"), states:

**Parties**

1.　　KBA is a corporation incorporated under the laws of the State of Indiana with its principal place of business in Indiana. KBA is a third-party administrator of self-funded employee welfare benefit plans. KBA's clients are employers who wish to offer employee welfare benefit plans to their employees and other third party administrators with employer clients who wish to offer employer welfare benefit plans to their employees. KBA provides and administers such plans for its clients, and its clients pay KBA fees based on the services provided and the number of employees enrolled in and receiving benefits under the plan in each case.

2.　　Teladoc is a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of New York. Teladoc is a so-called

"telemedicine" provider. It provides individuals and groups with telephonic and web-based access to physicians for consultations regarding medical advice, diagnoses, and prescription medications. Teladoc trades on the New York Stock Exchange under the symbol TDOC.

3. HY is in the same business as Teladoc and is Teladoc's wholly owned subsidiary.

**Background**

4. In October, 2016, KBA entered into an arrangement with HY. Pursuant to, and in reliance on, that arrangement, KBA began using HY's services in connection with the employee welfare benefit plans that it offered to and administered for its clients. By that means, KBA's clients' employees who were enrolled in a welfare benefit plan that included telemedicine services could consult with physicians via telephone or the web and receive medical advice, diagnoses, and prescription medications. KBA made HY's telemedicine services available to over 50,000 of KBA's clients' employees.

5. In 2017, Teladoc acquired HY. Teladoc and HY now act in concert.

6. Knowing that KBA (a) had incorporated HY's telemedicine services into the welfare benefit plans that KBA offered to and administered for KBA's clients and (b) depended upon the continuing availability of such telemedicine services, Teladoc sought to renegotiate the terms under which KBA paid for such telemedicine services.

7. Under KBA's arrangement with HY, KBA paid monthly for each individual or employee who received the benefits of HY's telemedicine services under a welfare benefit plan administered by KBA and on which KBA had collected payment. This "Per Employee Per Month" ("PEPM") charge was the applicable rate per employee for HY's services (i) paid by a given KBA client (ii) to KBA and (iii) then remitted by KBA to HY.

8. After Teladoc acquired HY, Teladoc sought to change how the PEPM was assessed and paid. Teladoc proposed (a) to invoice KBA on the first day of each month for the telemedicine services "to be provided" to KBA's clients' employees in the ensuing month, based on the most current eligibility file showing the number of individuals and employees participating in such services, and (b) that KBA be responsible for paying all PEPM and other fees (i) upon receipt of Teladoc's invoice, and (ii) irrespective of whether KBA collected such fees from its clients.

9. If accepted by KBA, such change would have boosted Teladoc's cash flow and, presumably, its attractiveness to investors.

10. KBA declined to consent to pay Teladoc PEPM fees prospectively based on the number of individuals and employees who were thought to be eligible for such services and irrespective of whether KBA collected such fees from its clients.

11. In response to KBA's decision, Teladoc proposed as an alternative that (a) it would invoice KBA on the first day of each month based on the most current eligibility file showing the number of individuals and employees actually participating in such services; (b) KBA in turn would (i) remit to Teladoc the PEPM fees received from its clients by the 25th of each month, but (ii) not be responsible for amounts due but not received from clients by the 25th; and (c) if KBA failed to remit amounts due from a given client within sixty (60) days after Teladoc's invoice, then Teladoc would have the right to cancel Teladoc's services as to that client, with the result that none of that client's employees participating in the KBA-administered welfare benefit plan would be able to use Teladoc's telemedicine services ("Teladoc's Alternative Proposal").

US.118787355.01

12. The parties operated under Teladoc's Alternative Proposal while the parties attempted to negotiate terms of a written contract to replace the parties' oral arrangement, with the proviso that KBA would "self-bill" itself each month based on the number of employees actually participating in the Teladoc program and pay Teladoc based on that self-bill from funds received from its clients for those participants, and Teladoc and KBA have since been operating in accordance with this process.

13. On or about January 26, 2018, Teladoc notified KBA that the original billings were based on an employee Teladoc service utilization rate of 40% by eligible persons, which carried a higher PEPM billing rate. The actual Teladoc service utilization rate was approximately 4%, which carried a lower PEPM billing rate. Teladoc, through its VP Paul Kowalski, advised KBA that, as a result of this error, Teladoc had overcharged KBA and offered to credit KBA's future bills by $450,000 (the "Overcharges") to resolve the issue.

14. KBA does not know whether Teladoc has made the same error with respect to others who became Teladoc customers as a result of Teladoc's acquisition of HY.

15. After Teladoc notified KBA of the Overcharges of PEPM fees, Teladoc expressed to KBA that it was having difficulty structuring a refund of the full Overcharges because of the potential negative impact on Teladoc's financial statements. Teladoc initially told KBA that it would reimburse KBA for the Overcharges by providing KBA (a) a credit of $225,000 against KBA's billings for services, and (b) another $225,000 credit against a bill that Teladoc anticipated it would issue to KBA for so-called "Best Doctors" services that Teladoc expected to begin providing to KBA. Later, however, Teladoc suggested that it would provide KBA a $225,000 credit against its future bills under its existing contract with Teladoc rather than against an anticipated bill for "Best Doctors" services.

US.118787355.01

16. Thereafter, however, Teladoc changed its position on crediting KBA for the Overcharges. Teladoc admitted to KBA that its accounting system is different from HY's accounting system. Teladoc advised KBA that, instead of booking revenue based on the actual number of employees for whom the PEPM is payable each month, with a discount to account for possible non-payment by KBA's clients, Teladoc **booked and reported** revenue based on the number of employees who are *eligible* to participate in a plan for which the PEPM is payable rather than on those who actually participated in the Teladoc program. In order to try to preserve this accounting error, Teladoc wanted to assert that KBA owed Teladoc more than $750,000. In response, Larry Dust, CEO of KBA, told Kowalski that KBA would not be a party to the restructuring of Teladoc's books and records.

17. In an email on June 14, 2018, Tom Satarino, President of American Health Data Institute, an affiliate of KBA, told Kowalski of Teladoc, that "KBA cannot be a party to reconstructing [T]eladoc's financial events."

18. Teladoc also notified KBA that it was reducing the amount of Overcharges to $350,000. In a follow-up email on June 20, 2018, Satarino explained to Kowalski that KBA had come to understand that Teladoc's reduction of the Overcharges had resulted from Teladoc's "removing individual terminations on the file but not removing from [its] count/revenue and therefore the billing to KBA, the group terminations because they were not specifically noted as term[inations], even though the overall member count decreased on the file." Satarino told Kowalski, "This just doesn't seem to be a logical way to account for membership, and it is not consistent with the process we've had in place since we began working with HY."

19. On or about June 28, 2018, Satarino notified Kowalski that KBA had decided to transfer roughly 50,000 of the individuals to whom KBA is providing telemedicine services

through Teladoc to another telemedicine service-provider, leaving roughly 10,000 employees and their dependents to whom KBA continues to provide telemedicine services through Teladoc. Satarino followed up with an email to Kowalski, attaching "a file comprised of all members that KBA wishes to continue on with [T]eladoc, post 7/1/2018."

20. Late that same day, June 28, 2018, Kowalski emailed Satarino saying (a) that it was "unfortunate that things went sideways as they have," (b) that he "was completely unprepared for such an abrupt move," and (c) that he was "sorry it needed to get to that." Kowalski went on to say, "We [Teladoc] certainly don't want to lose this block" of business. Accordingly, Kowalski said that Teladoc would be willing to "reprice its services."

21. KBA declined Teladoc's offer to reduce its PEPM to retain the 50,000-person block of business.

22. At 6:46 p.m. Eastern time on Saturday, June 30, 2018, Kowalski emailed Satarino, with a copy to Dust, stating:

> Yesterday afternoon and into today, our executive team has been in additional discussions about this situation. Our conclusion is that KBA's move to terminate nearly 50k EEs with a 2 day notice is unprofessional and unacceptable. This kind of a move makes it clear that this is not a partnership, and as such, we no longer wish to have any business relationship with KBA. We will be terminating the entire block, ASO lives included at midnight tonight, and consider the relationship terminated effective 12:00am [sic] on July 1, 2018. Final billing will be sent in the coming days.

Kowalski did not mention Teladoc's accounting error, the Overcharges, credit for the Overcharges, Teladoc's efforts to get its books right, or his earlier statements that it was "unfortunate that things went sideways" and that he was "sorry it needed to get to that."

6

23. Teladoc made good on its threat to terminate, *less than six (6) hours after Kowalski's Saturday evening email*, all telemedicine services to the roughly 10,000 individuals who were still eligible for and receiving telemedicine services from Teladoc via KBA.

24. As a result of Teladoc's action, more than 10,000 individuals who had previously had, and come to rely upon, the ability to consult with a physician by phone or the web and obtain immediate medical advice, diagnoses, and prescriptions for medications were abruptly cut off as of July 1, 2018.

25. While KBA can seek to replace Teladoc's services for those roughly 10,000 people, such a replacement takes time to plan, coordinate, and implement and cannot be done in the near term.

26. KBA has been forced to tell individuals who have abruptly lost their telemedicine services that they should try to contact their own physicians if they have one, an outpatient medical provider such as a free-standing clinic or emergency room or, in cases of emergency, to call 911.

27. No longer being able to access the Teladoc telemedicine program may put at risk the health of individuals who have come to depend on the program. Further, having to use a personal physician, outpatient medical provider or an emergency room, will increase the cost of healthcare to such individuals which could put their family finances at risk.

28. Healthcare costs to the employer's group health plan would also increase as a result of individuals not being able to use the telemedicine program.

29. The abrupt cancellation of the Teladoc telemedicine program will likely result in irreparable harm to KBA in its relations with its employer clients and TPA clients, and that problem is exacerbated by Teladoc's more recent behavior, described below.

30. In view of all these facts, KBA engaged counsel to prepare a Verified Complaint and to seek a temporary restraining order.

31. Before filing the action, KBA's counsel sent a copy of the Verified Complaint to Teladoc's counsel on July 3, 2018.

32. KBA has now learned that (a) after Teladoc's counsel received a copy of the (unfiled) Verified Complaint, and (b) while KBA was awaiting a response from Teladoc concerning whether Teladoc would restore the telemedicine services that Teladoc had abruptly terminated at midnight on July 1, Teladoc was surreptitiously and falsely representing to one or more KBA clients that KBA, rather than Teladoc, had terminated the telemedicine coverage that KBA was obligated to provide to the clients' plan enrollees. Further, after falsely stating that KBA had terminated Teladoc's service, Teladoc emailed one or more KBA clients stating that, although "HealthiestYou coverage … has been terminated effective immediately … if you wish to continue coverage, please contact me to setup a direct contract."

33. In other words, Teladoc suckered KBA into waiting to file its lawsuit in the hope and expectation that Teladoc would restore the coverage that Teladoc had abruptly terminated, and in the interim lied to at least one (and presumably other) of KBA's customers for the purpose of trying to cut KBA out of the picture and steal the business for itself.

34. KBA has no adequate remedy at law.

35. Defendants' behavior has been willful and malicious, calculated to harm KBA in retaliation for KBA's refusal to be complicit in Teledoc's misbehavior.

36. All conditions precedent to KBA's claims have been performed, have occurred, or have been excused.

## Count I

37. KBA incorporates by reference the allegations in paragraphs 1 through 36.

38. Defendants have breached their obligations to KBA.

39. KBA is suffering irreparable harm to its reputation as a result. The extent of the harm that KBA is suffering and will continue to suffer is immeasurable given that it is not possible to predict how many plan beneficiaries who rely upon the telemedicine services that KBA is obligated to make available will need such services but not be able to access them.

## Count II

40. KBA incorporates by reference the allegations in paragraphs 1 through 36.

41. KBA has suffered a pecuniary loss as a result of the Overcharges.

42. Having acknowledged the Overcharges but refused to refund them, Defendants have converted KBA's property.

## Count III

43. KBA incorporates by reference the allegations in paragraphs 1 through 36.

44. By falsely representing to KBA's clients that KBA terminated Teladoc's telemedicine services (and thus that KBA abruptly and without notice left KBA's clients and their enrollees in the lurch), Defendants have defamed KBA.

## Count IV

45. KBA incorporates by reference the allegations in paragraphs 1 through 36.

46. By falsely representing to KBA's clients that KBA terminated Teladoc's telemedicine services and then soliciting KBA's customers' business for itself, Defendants have tortiously interfered and are tortiously interfering with KBA's existing contractual relationships and with KBA's prospective economic advantage.

WHEREFORE, KBA requests that the Court:

A. Enter a temporary restraining order and preliminary injunction requiring Defendants to continue to provide telemedicine services to KBA's clients' enrollees until such time as KBA can obtain and implement replacement services;

B. Enter a temporary restraining order and preliminary injunction requiring Defendants immediately to stop defaming KBA and interfering tortiously with KBA's relationships as described in Counts II and III;

C. Enter judgment against Defendants for KBA's damages according to proof under Count I, together with punitive damages in an amount sufficient to punish Defendants and to deter them and others similarly situated from engaging in such malicious behavior in the future;

D. Enter judgment against Defendants for KBA's pecuniary loss under Count II, together with treble damages, interest, costs, and attorneys' fees;

E. Enter judgment against Defendants for KBA's damages according to proof under Count III, together with punitive damages in an amount sufficient to punish Defendants and to deter them and others similarly situated from engaging in such malicious behavior in the future;

F. Enter judgment against Defendants for KBA's damages according to proof under Count IV, together with punitive damages in an amount sufficient to punish Defendants and to deter them and others similarly situated from engaging in such malicious behavior in the future; and

      G.  Award KBA all other appropriate relief.

                                          Respectfully submitted,

                                          FAEGRE BAKER DANIELS LLP

                                          */s/ David K. Herzog*
                                          David K. Herzog (#8021-49)
                                          Matthew T. Albaugh (#23293-49)
                                          Amy G. Dunn (#34428-29)
                                          300 N. Meridian Street, Suite 2700
                                          Indianapolis, IN 46204
                                          Tel: 317-237-0300
                                          Fax: 317-237-1000
                                          David.Herzog@FaegreBD.com
                                          Matthew.Albaugh@FaegreBD.com
                                          Amy.Dunn@FaegreBD.com

## Verification

I, Wallace Gray, affirm under the penalties for perjury, that I am the Vice President, General Counsel, and Chief Legal Officer of Plaintiff Key Benefit Administrators, Inc., and that the facts set forth in the foregoing First Amended Verified Complaint are true to the best of my personal knowledge.

_____
Wallace Gray

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Motion for Temporary Restraining Order and Preliminary Injunction has been served upon the following parties by via U.S. mail, postage prepaid and via electronic mail, on this 5th day of July, 2018:

>Meredith T. White
>BARNES AND THORNBURG LLP
>11 South Meridian Street
>Indianapolis, IN 46204
>meredith.white@btlaw.com
>
>Jessica M. Lindemann
>BARNES AND THORNBURG LLP
>11 South Meridian Street
>Indianapolis, IN 46204
>meredith.white@btlaw.com

>/s/ David K. Herzog

US.118787355.01