UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEY BENEFIT ADMINISTRATORS, INC. <br><br> Plaintiff, <br> v. <br><br> TELADOC, INC. and <br> HY HOLDINGS, INC. d/b/a <br> HEALTHIEST YOU <br> Defendants. | Case No. 1:18-cv-2051-JMS-MPB |

**TELADOC'S OPPOSITION TO KEY BENEFIT ADMINISTRATORS'
MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

Defendants Teladoc, Inc. and HY Holdings, Inc. d/b/a Healthiest You (collectively "Teladoc"), by and through their attorneys, hereby oppose Key Benefit Administrators, Inc.'s ("KBA's") Motion for Leave to File a Second Amended Complaint and state as follows:

**I.   INTRODUCTION**

KBA's Motion for Leave to File a Second Amended Complaint should be denied because the amendment would be futile. All of the claims involved in this lawsuit were resolved when the parties entered into a valid and binding settlement agreement whereby KBA made a final payment of $144,161.15 to Teladoc in exchange for full, mutual releases between KBA and Teladoc. Teladoc accepted the payment and the terms of the settlement. After the settlement agreement was formed, KBA attempted to renege on its promises and back out of the contract. For the reasons described in Teladoc's Motion to Enforce Settlement Agreement, the contract was properly formed, and amendment would be futile because the case has settled.

KBA's Motion for Leave and proposed Second Amended Complaint attempt to frame this dispute as an incidence of Teladoc "playing gotcha" and keeping money that Teladoc knows

1

it does not deserve. KBA tries to accomplish this by combining two separate settlement negotiations that, in reality, stand alone. The first negotiation resolved KBA's request for "emergency" relief. In that negotiation, Teladoc agreed to turn its services back on for KBA clients at a set price, and KBA withdrew its request for a temporary restraining order. The second negotiation and settlement globally resolved all aspects of the lawsuit – *i.e.*, the parties' respective claims for damages resulting from their business relationship. In this second negotiation, KBA offered to pay $144,161.15 in exchange for a "walk-away" with mutual releases – a global and complete resolution of the claims between the parties. While KBA attempts to blend the two, painting the picture of a single negotiation involving a hurried effort to resolve KBA's request for emergency relief, in reality that request had been resolved for over a week at the time the parties separately settled all outstanding claims between the parties. As shown below, the e-mails exchanged between KBA and Teladoc belie KBA's claims and instead show that the payment was accepted as part of a global settlement of all claims between the parties. The parties have settled the claims involved in this dispute, and the Court should deny KBA's Motion for Leave and grant Teladoc's Motion to Enforce Settlement.

## II.     BRIEF FACTUAL BACKGROUND

### A.     Teladoc's Business.

Teladoc is in the business of providing non-emergency telemedicine services to more than 20 million members. [Filing No. 24-1 at ¶ 2 (Declaration of Paul Kowalski ("Kowalski Decl.").] Teladoc members can access remote medical services 24 hours a day, seven days per week via the internet, phone, or mobile app. [Kowalski Decl. ¶ 2.]

Teladoc typically provides its services to members as part of an employee benefits package. [*Id.* ¶ 3.] While Teladoc sometimes contracts directly with employers, it often contracts

with third party administrators ("TPAs"), such as KBA. [*Id*.] TPAs contract with employee groups to administer their benefits packages and engage Teladoc to provide telemedicine benefits to the TPAs' clients. [*Id*.]

### B. KBA Engages Teladoc to Provide Telemedicine Services.

In 2016, KBA engaged Teladoc to provide telemedicine services as part of the benefit packages it offered its customers. [Filing No. 11 (Amended Verified Compl. ¶ 4).] KBA agreed to pay for basic access to Teladoc's services at a "per employee per month" (or "PEPM") rate. [Kowalski Decl. ¶ 4.] This PEPM rate was not based on any member's usage, but rather a set amount for each member eligible for Teladoc services in a given month. Stated differently, KBA paid Teladoc for each member's ability to access the telemedicine services, regardless whether the member actually did so. [*Id*.]

### C. The Parties' Relationship Deteriorates.

In early 2018, the parties began negotiating an amendment to their original arrangement. [*Id.* ¶ 5.] There were a number of things at issue in these negotiations: the accuracy of KBA's eligibility data,[1] the pricing going forward, and other issues. [*Id.*] While negotiations were ongoing, Teladoc continued providing services to KBA members based on the eligibility information KBA provided. [*Id.* ¶ 6.] KBA, for its part, stopped paying Teladoc in full for these services. [*Id.*]

---

[1] The eligibility data, which reflects how many users should be receiving services, is critical to both ensuring that the proper users have access to the service and to billing accurately. Teladoc based its services on the eligibility data (list of eligible members) KBA provided each month. KBA would later come back and attempt to revise the eligibility data it had previously provided, claiming that the data included, for example, employees who had been terminated and should not have received services. KBA's customers did not want to pay for those individuals. KBA then sought to have Teladoc absorb the cost of the inaccuracy of KBA's data, even though Teladoc made its services available to everyone on the eligibility list KBA provided. This was a source of tension in the parties' relationship.

On June 28, 2018, KBA terminated the parties' agreement with respect to 50,000 out of approximately 60,000 members. [Filing No. 11 (Amended Verified Compl. ¶ 19); Kowalski Decl. ¶ 7.] Given issues with KBA's payments and the deterioration of the parties' relationship reflected by KBA's termination decision, Teladoc concluded that the parties should simply part ways. [Kowalski Decl. ¶ 8.] Therefore, Teladoc terminated the remaining 10,000 members. Since KBA had already found an alternative provider for the 50,000 members, Teladoc did not believe it would be difficult to move the remaining users to the same platform. [*Id.*]

    **D.**    **KBA Files Suit and Seeks Emergency Relief.**

On July 3, 2018, KBA filed suit against Teladoc seeking a temporary restraining order and injunctive relief to reinstate the 10,000 members, as well as other claims alleging monies were owed to KBA. Teladoc removed the case to this Court [Filing No. 1], and the Court set KBA's Motion for Temporary Restraining Order and Preliminary Injunction for hearing on July 9, 2018 at 4:00 p.m. [Filing No. 10.] The Court also set a status conference with Magistrate Judge Brookman earlier the same day. Teladoc employees and counsel worked over the July 4 holiday and weekend to respond to the complaint and prepare for the hearing and status conference.

    **E.**    **First Settlement Negotiations Resolve the Injunctive Relief Issues.**

Teladoc and KBA engaged in discussions to resolve the injunctive relief – service for the 10,000 members – including the exchange of multiple draft terms.

On Friday, July 6, 2018, Teladoc sent a letter to KBA and proposed a settlement of KBA's Motion for Temporary Restraining Order and Preliminary Injunction whereby Teladoc would reinstate telemedicine services for KBA members at a particular PEPM, paid up front. [Filing No. 27-1, (M. White 7/6/2018 Letter to D. Herzog).] The letter specifically stated that the potential "agreement would be entirely separate and distinct from the parties' disputes about past

4

services, billing and payment … [t]hose disputes would remain unresolved and wholly separate." [*Id.*]

KBA responded with a counter-offer the same day. [Filing No. 27-2 (M. Albaugh 7/6/2018 Email to M. White).] KBA proposed Teladoc reinstate services for an indeterminate amount of users and that KBA pay Teladoc in arrears for only the KBA users who actually paid KBA for the telemedicine services. [Id.] KBA's counteroffer also included non-disparagement and non-solicitation clauses. [*Id.*]

Teladoc provided a counter-offer of its own on Saturday, July 7, 2018. [Filing No. 27-3, (M. White 7/7/2018 Letter to M. Albaugh).] Teladoc only specifically countered four aspects of KBA's proposal. [*Id.*] Most importantly, Teladoc objected to KBA paying Teladoc only for users who actually paid at the end of a billing cycle. [*Id.*]

On Sunday, July 8, 2018 – the day before the injunctive relief emergency hearing – Matt Albaugh informed Meredith White that KBA would not be able to respond until the day of the hearing. [Filing No. 27-4 (M. Albaugh's 7/8/2018 Email to M. White).] KBA suggested calling the Court in the morning to push the hearing back a day and leave time for negotiations. On July 9, 2018, the morning of the hearing, KBA informed Teladoc that it believed the parties were close to a deal and would respond to Teladoc's offer rather than postpone the hearing. [*Id.*] KBA provided that response three hours before the hearing (and less than two hours before the status conference with Magistrate Judge Brookman). [Filing No. 27-6 (M. Albaugh's First 7/9/2018 Email to M. White).] In the end, to avoid burdening the Court, Teladoc made a reasonable counteroffer, which KBA accepted to settle the pending injunctive relief issues. [Filing No. 27-9 (M. Albaugh's Third 7/9/2018 Email to M. White).] The parties settled these issues less than one hour before the scheduled status conference with Magistrate Judge Brookman.

As a result of this first settlement, KBA withdrew its motion requesting emergency relief, while Teladoc agreed to reinstate services for the terminated members at an agreed rate. [Filing No. 16.] Ultimately, it turned out that, despite KBA's request for "emergency" relief and its ongoing efforts to negotiate settlement of those issues, KBA did not need Teladoc's services restored for any of its clients. [Filing No. 24-2 (7/9/2018, 3:49 p.m. Email from M. Albaugh to M. White).] In summary, these negotiations concluded and the emergency relief issues were settled on July 9, 2018.

### F.     Second Settlement Negotiations: The Parties Globally Settle All Claims.

With the injunctive relief issues resolved, counsel for KBA and Teladoc engaged in settlement discussions to globally address and resolve the disputes between the parties. Generally speaking, KBA claimed that Teladoc owed it damages for alleged overpayments made during the course of their business relationship and for cancelling the parties' arrangement with respect to the remaining 10,000 members while Teladoc claimed that KBA owed Teladoc payment for its past services. On July 18, 2018 via telephone, KBA proposed making a final payment to Teladoc for Teladoc's services and dismissing its claims against Teladoc. When Teladoc accepted the payment, the parties would exchange mutual releases. The next day, in follow up to that phone call, KBA drafted a settlement offer to Teladoc, attaching a copy of a check already submitted to Teladoc for $144,161.15. [Filing No 24-3 (7/19/2018, 3:09 p.m. Email from M. Albaugh to M. White).]

**From:** Albaugh, Matthew T.
**Sent:** Thursday, July 19, 2018 3:09 PM
**To:** White, Meredith <Meredith.White@btlaw.com> (Meredith.White@btlaw.com) <Meredith.White@btlaw.com>
**Subject:** KBA/Teladoc

6

Meredith: Following up on our conversation yesterday, I write to inform you that KBA remitted payment to Teladoc today in connection with the parties' arrangement for June 2018 services. A copy of the check and associated report are attached.

Consistent with our conversation, you'll follow-up promptly with Teladoc to confirm receipt. If additional issues need to be discussed about KBA's remittance payment for June 2018 services, you'll let me know as soon as possible. Assuming there will be no such issues, we orally agreed that KBA will dismiss its claims against Teladoc with prejudice in exchange for full, mutual releases between KBA and Teladoc/HY. In other words, KBA's July 2018 payment for June 2018 services will be the final payment between the parties, and there will be no attempt by either party to seek recovery of additional monies or relief, either in connection with KBA's lawsuit against Teladoc/HY, potential counterclaims that Teladoc/HY could have asserted, or otherwise.

I look forward to hearing from you soon.

Thanks, Matt

[*Id.*] The check KBA provided with its offer did not contain any qualifications. [*Id.*]

Teladoc considered KBA's offer over the next several days. While the payment of $144,161.15 was substantially lower than the total outstanding amount KBA owed to Teladoc, Teladoc determined it was a fair price for the June 2018 services made available to KBA's users and that it was in Teladoc's best interest to accept this amount and settle all claims with a mutual release.[2] Teladoc accepted KBA's offer four days after it was made, responding directly to it by email on July 23, 2018 at 10:24 a.m. [Filing No 24-4 (7/23/2018, 10:24 a.m. Email from M. White to M. Albaugh)]. Specifically, Ms. White said: "Matt - My client has received the final payment and is agreeable to a walk away (no payments exchanged), dismissal with prejudice and mutual release. Do you want to draft a release doc for my review?" [*Id.*]

---

[2] The eligibility numbers the payment reflects fall within a reasonable range Teladoc would expect for June 2018 services, although the eligibility file it originally received from KBA would warrant a higher payment. The discrepancy between the eligibility file and payment is indicative of the type of problems Teladoc encountered with KBA throughout the parties' business arrangement.

### G. KBA Reneges on the Parties' Settlement Agreement and Accuses Teladoc of Conversion for Receiving Settlement Funds KBA Voluntarily Paid.

Six hours after Teladoc accepted KBA's offer, Mr. Albaugh e-mailed Ms. White – tellingly not responding to Ms. White's e-mail accepting KBA's settlement offer – and claimed that KBA was entitled to a nearly 90% refund of final payment it had made. [Filing No 24-5 (7/23/2018, 4:27 p.m. Email from M. Albaugh to M. White)]. KBA claimed the final payment amount KBA submitted contained two errors. [*Id*.] First, KBA claimed that the payment should have included a $0.75/life discount for certain members. [*Id*.] Second, KBA's payment allegedly included payments for July 2018 services that were never rendered. [*Id*.]

On July 30, 2018, Teladoc wrote to KBA and explained that it intended to hold KBA to its settlement agreement. [Filing No 24-6 (7/30/2018 Letter from M. White to M. Albaugh)]. Teladoc recounted the formation of the settlement agreement and rejected KBA's attempted "bait and switch" game. [*Id*.] As Teladoc explained, KBA's alleged "errors" ignore the fact that the final payment was never offered in any qualified way; instead the $144,161.15 was intended to be a final payment by KBA to Teladoc, as part of an offer to completely resolve all claims. Teladoc advised that it would not return the final settlement payment and hoped that KBA would abide by the terms of the settlement. [*Id*.]

KBA responded and accused Teladoc of conversion for keeping money properly paid as part of a legally binding settlement agreement. [Filing No 24-7 (8/1/2018 Letter from M. Albaugh to M. White)]. KBA's refusal to follow through with the settlement and its represented intention to proceed with the (now settled) claims in this lawsuit necessitated Teladoc's Motion to Enforce Settlement Agreement. [Filing No. 23.]

H. **KBA Moves for Leave to Amend Its Complaint to Include a Claim for Conversion of the Funds It Voluntarily Paid to Settle this Lawsuit.**

On August 22, 2018, KBA filed its Motion for Leave to File Second Amended Complaint. [Filing No. 22.] KBA seeks to add claims for conversion and unjust enrichment. [*Id.* ¶ 9.] In its Motion, KBA claims that:

> Over the following days, KBA and Teladoc engaged in discussions about potential resolution of the matters raised in KBA's temporary restraining order. KBA offered to remit to Teladoc fees for June 2018 services provided by Teladoc and properly due to Teladoc, in exchange for withdrawing its motion for temporary restraining order and related claims. Teladoc indicated it would agree to such an arrangement.

[*Id.* ¶ 3.] It further claims that "[i]n its haste to promptly get payment for June 2018 services to Teladoc, KBA issued a $144,161.15 check to Teladoc, inadvertently including monies collected from KBA's clients for *July 2018* services that were due to KBA, and not Teladoc." [*Id.* ¶ 4.] KBA's Motion does not address the history of the parties' settlement negotiations in any detail.

### III. ARGUMENT

Any amendment would be futile because this case has settled. KBA attempts to interject confusion about the settlement agreement by combining two separate settlement negotiations, making it appear that KBA hastened to calculate and pay $144,161.15 in an emergent situation. Not so. The negotiations concerning KBA's request for emergency relief concluded on July 9th and KBA withdrew its motion for temporary restraining order at that time. KBA did not offer the $144,161.15 payment to resolve all claims between the parties until ten days later. Teladoc did not accept the offer until four days after that. Thus, the parties' second, global settlement agreement was formed two weeks after they resolved KBA's request for emergency relief. Moreover, KBA calculated and offered the $144,161.15 payment without an invoice or input from Teladoc. The payment was an offer, generated by KBA, which was accepted by Teladoc.

9

The parties' communications (offer and acceptance) formed a binding settlement agreement, rendering KBA's effort to amend its complaint futile. KBA calculated the final payment itself and made the offer to resolve all claims between the parties in exchange for mutual releases. There was no external pressure on KBA to do so, and KBA did not qualify its settlement offer. Teladoc agreed to KBA's offer. The Court should honor that agreement and deny KBA's Motion for Leave to File Second Amended Complaint.

### A. Legal Standard

"Although Rule 15 states that leave to amend shall be 'freely given,' it may be denied where there is undue delay, bad faith, dilatory motive, a repeated failure to cure deficiencies, undue prejudice to the opponent, or where the amendment would be futile." *Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir. 1992). "Futility is measured by the capacity of the amendment to survive a motion to dismiss." *Coleman v. City of Indianapolis*, No. 117-CV-01561-JMS-MJD, 2018 WL 3195163, at *4 (S.D. Ind. Mar. 15, 2018) (citing *Crestview Village Apts. v. U.S. Dep't Of Housing & Urban Dev.*, 383 F.3d 552, 558 (7th Cir. 2004)); *see also See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015) (holding that "[w]here it is clear that the defect cannot be corrected so that amendment is futile," leave to amend may be denied). Amendment should therefore be denied where there is no path forward for the case.

### B. Amendment Would Be Futile Because KBA and Teladoc Formed A Valid and Enforceable Settlement Agreement Releasing All Claims.

Under Indiana law the formation of a settlement agreement is analyzed like any other contract.[3] "A settlement agreement constitutes a compromise; the underlying purpose is to end a

---

[3] For the reasons set forth in Teladoc's Motion to Enforce Settlement Agreement, this Court can – and should – enforce valid settlement agreements. [Filing No. 24 at 6-7]; accord *Davis v.*

claim or dispute and avoid, forestall, or terminate litigation." *Vance v. Lozano*, 981 N.E.2d 554, 558 (Ind. Ct. App. 2012). The court in which a settlement was reached has the authority to enforce it. *Harding v. State*, 603 N.E.2d 176, 179 (Ind. Ct. App. 1992). In doing so, courts are to apply the same general principles of contract law as with any other agreement. *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180 (Ind. Ct. App. 2011). The existence of a contract is a question of law. *Batchelor v. Batchelor*, 853 N.E.2d 162, 165 (Ind. Ct. App. 2006). The basic requirements are offer, acceptance, consideration, and "a meeting of the minds of the contracting parties." *Id*. To determine whether a contract is enforceable, there are two interrelated areas that must be considered: "intent to be bound and definiteness of term." *Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996). "[O]nly essential terms need be included in order to render a contract enforceable." *Id*. at 676. "A court will not find that a contract is so uncertain as to preclude specific enforcement where a reasonable and logical interpretation will render the contract valid." *Conwell v. Gray Loon Outdoor Marketing Group, Inc.*, 906 N.E.2d 805, 813 (Ind. 2009).

Here, there is a valid and enforceable contract. KBA offered to pay a full and final payment in exchange for a "walk-away" settlement in which the parties would mutually release their remaining claims. Teladoc accepted the offer. These terms are sufficiently definite as a matter of Indiana law. KBA sent the amount due, and Teladoc accepted that payment. The fact that KBA later regretted its payment and claimed that it overpaid is irrelevant. The Court should enforce the settlement.

### 1. KBA made a valid offer, which Teladoc properly accepted.

The definitions of offer and acceptance under Indiana law are familiar. An offer requires "the manifestation of willingness to enter into a bargain, so made as to justify another person in

---

*Raytheon Tech. Servs. Co. LLC*, No. 1:10-CV-1365-JMS-MJD, 2012 WL 5499416, at *1 (S.D. Ind. Nov. 13, 2012).

understanding that his assent to that bargain is invited and will conclude it." *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005) (citing Restatement (Second) of Contracts § 24). Acceptance must mirror the terms of the offer and properly communicate the willingness to be bound to the terms of the offer. *Ellison v. Town of Yorktown*, 47 N.E.3d 610, 617-618 (Ind. Ct. App. 2015).

KBA made an offer when Mr. Albaugh communicated to Ms. White that KBA was willing to make a full and final payment to KBA and "dismiss its claims against Teladoc with prejudice in exchange for full, mutual releases between KBA and Teladoc/HY." [Filing No 24-3 (7/19/2018, 3:09 p.m. Email from M. Albaugh to M. White)]. This happened not once, but twice (first via phone, and then in writing via email). The amount of the final payment was not qualified in any way. Instead, KBA provided a copy of a check for $144,161.15.[4] Teladoc did not request this amount or submit an invoice to KBA. KBA calculated, prepared, and offered a check in this amount as part of its settlement offer. KBA's claim in its Motion that it calculated the payment in "haste," in addition to being irrelevant, is inconsistent with the record of the parties' negotiations. Teladoc was not pressuring KBA for payment, and the emergency issues had been resolved more than a week prior to KBA's offer to settle for $144,161.15.

Teladoc accepted KBA's offer, including the payment sum, when Ms. White responded. Ms. White's response mirrored the terms of KBA's offer and clearly demonstrated intent to be bound: "My client has received the final payment and is agreeable to a walk away (no payments exchanged), dismissal with prejudice and mutual release. Do you want to draft a release doc for

---

[4] Mr. Albaugh's email to Ms. White makes clear that the payment was contingent only on Teladoc's approval, as he clearly states that "[i]f additional issues need to be discussed about KBA's remittance payment for June 2018 services, *you'll let me know* as soon as possible." [Filing No 24-3 (7/19/2018, 3:09 p.m. Email from M. Albaugh to M. White) (emphasis added).] He did not state that KBA needed to validate the payment or otherwise qualify the offer. [*Id.*]

12

my review?" [Filing No 24-4 (7/23/2018, 10:24 a.m. Email from M. White to M. Albaugh)]. Under Indiana law, these e-mails constitute proper offer and acceptance.

### 2. The parties' global settlement agreement contained sufficiently definite essential terms.

The proposal by counsel for one party to exchange the dismissal of its client's claims for the mutual release of the other party's claims is sufficiently definite as a matter of law in Indiana. *See Sands* 945 N.E.2d at 181. *Sands* is instructive here. In that case the Indiana Court of Appeals faced a similar situation: counsel for one party e-mailed opposing counsel and offered to dismiss its claims in a Wisconsin lawsuit in exchange for a "mutual release" from the other party dismissing its claims in the Indiana case. *Id*. at 179. Opposing counsel responded "deal," and the contract was formed. *Id*. Based on these facts, the Indiana Court of Appeals held that the parties' communications formed a sufficiently definite and binding settlement contract.

The same is true here. Mr. Albaugh's e-mail offering for KBA to make a final payment to Teladoc and dismiss KBA's claims against Teladoc in exchange for a mutual release is sufficiently definite to form a contract. The phrase "mutual release" mirrors the facts of *Sands*. There is no ambiguity that the parties intended for the June 19 payment to constitute a final payment and for the parties to execute a mutual release.

It appears that KBA's strategy is now to combine the two, separate settlement negotiations into one to inject ambiguity into the discussion. Indeed, KBA's Motion for Leave states that "KBA offered to remit to Teladoc fees for June 2018 services provided by Teladoc and properly due to Teladoc, in exchange for withdrawing its motion for temporary restraining order and related claims." [Filing No. 22 ¶ 3.] As shown above, that is wrong. There was no discussion of payment for June 2018 services in the initial settlement discussions that concluded on July 9, 2018 and resolved the injunctive relief issues. KBA had withdrawn its motion for

temporary restraining order by the time KBA calculated and offered the final payment issue. And the focus of the second discussion was on full resolution of the case including, but certainly not limited to payment for June 2018 services. Contrary to KBA's contentions here, the terms were sufficiently definite, and a settlement agreement has been formed.

Amendment would be futile because the parties have agreed to settle the remaining claims in this lawsuit, and the Court should enforce that agreement.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny KBA's Motion for Leave to File a Second Amended Complaint. Teladoc respectfully requests that the Court enforce the parties' settlement agreement and dismiss KBA's Complaint with prejudice, or alternatively, enforce the agreement and enter judgment in Teladoc's favor, and enter all other just and proper relief.

Dated: August 29, 2018                                  Respectfully submitted,


*/s/ Jessica M. Lindemann*
Meredith Thornburgh White [28094-49]
Jessica M. Lindemann [31058-49]
J.T. Larson [31392-29]
BARNES & THORNBURG LLP
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Meredith.white@btlaw.com
Jessica.lindemann@btlaw.com
JT.Larson@btlaw.com

*Attorneys for Defendants Teladoc, Inc. and HY Holdings, Inc. d/b/a Healthiest You*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been filed electronically on this 29th day of August, 2018. Notice of this filing will be sent to the parties of record by operation of the Court's electronic filing system.

*/s/ Jessica M. Lindemann*